**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BILLY E. ROBINSON,
Plaintiff-Appellant,

v.                                                                                    No. 95-3067

OVERNITE TRANSPORTATION COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., District Judge.
(CA-95-300-7-3)

Argued: January 27, 1997

Decided: April 9, 1997

Before WILKINSON, Chief Judge, and
HAMILTON and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edwin Lake Turnage, Travelers Rest, South Carolina, for
Appellant. Jay Lloyd Grytdahl, BLAKENEY & ALEXANDER,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Dana C. Mitch-
ell, III, MITCHELL, BOUTON, DUGGAN, YOKEL, MCCALL &
CHILDS, Greenville, South Carolina, for Appellant. W. T. Cranfill,
Jr., BLAKENEY & ALEXANDER, Charlotte, North Carolina, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This dispute arises out of the termination of appellant Billy Robinson's employment with appellee Overnite Transportation Company (Overnite) on January 17, 1994. Robinson filed suit alleging claims for retaliatory discharge in violation of South Carolina Code § 41-1-80, breach of contract, breach of implied contract coupled with fraud, and violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654. The district court granted Overnite's motion for summary judgment as to Robinson's breach of contract claims and entered judgment in favor of Overnite following a bench trial on Robinson's retaliatory discharge and FMLA claims. Finding no error, we affirm.

I.

On December 3, 1988, Robinson completed an application for employment with Overnite, a trucking company engaged in the interstate transportation of freight, at Overnite's Gaffney, South Carolina facility. Included in the employment application was a disclaimer, providing that if the applicant was employed by Overnite, either he or Overnite could terminate his employment at any time and no writings contained in the application, employee handbook, or any other communications created a contract of employment for a definite or indefinite term. As part of the application process, Robinson disclosed to C.H. Nolley (Nolley), Overnite's Service Center Manager, that he had previously filed a workers' compensation claim while with a former employer.

On December 12, 1988, Nolley hired Robinson as a truck driver for Overnite. As a new employee, Overnite issued Robinson a copy of its Safety and Operating Rules and Regulations, which contained, immediately after the table of contents, a disclaimer identical in substance to that contained in the employment application.

2

In January 1993, Overnite issued its employees, including Robinson, a revised edition of its Employee Handbook (Handbook). Several provisions of the Handbook are pertinent to this appeal. First, the Handbook contained a disclaimer on page three under the heading "Forward" and just after the "Welcome" section, providing explicitly that statements in the Handbook were guidelines only and that an employment-at-will relationship existed between Overnite and its employees, a relationship that was not altered by anything contained in the Handbook.

The Handbook also contained a subsection on accident rules, including procedures to be followed in the event of an accident and possible punishments. Specifically, the Handbook provided that any driver involved in three preventable accidents within a twelve-month period would be terminated and that even one accident, depending on the circumstances and severity, could result in dismissal. Also included in the Handbook was a "Driver Appeal Policy," providing that any driver terminated for violations of Overnite safety regulations may appeal his termination through a detailed appeal process.

Finally, the Handbook contained a section on employee conduct. In this section, the Handbook provided that insubordination, or failure to follow instructions, was one of several behaviors that would subject an employee to disciplinary action, including dismissal.

On August 23, 1993, following the enactment of the FMLA,[1] Overnite issued a revised Family and Medical Leave Policy. Overnite posted a notice of the FMLA on its company bulletin boards and included it in the revised employee handbook distributed in June 1994, following the effective date of the FMLA. In addition, information about the FMLA was disseminated to employees in notices distributed with their paychecks, and the FMLA was discussed at employee meetings.

While he was employed with Overnite, Robinson filed two workers' compensation claims. His first workers' compensation claim arose out of an injury that occurred in 1991. As a result of this injury,

_____

[1] The FMLA became effective on August 5, 1993. See Family and Medical Leave Act, Pub. L. No. 103-3, 107 Stat. 6.

Robinson missed approximately thirty-five weeks of work and was paid medical and disability benefits. According to Robinson, he was satisfied and pleased with Overnite's handling of his first workers' compensation claim.

Robinson's second workers' compensation claim stemmed from an accident that occurred on December 22, 1993. At approximately 4:00 a.m., Robinson and his co-driver, Bobby Hawkins, were returning to Gaffney from Dallas, Texas, when Robinson fell asleep at the wheel, causing an accident. After veering off the shoulder of the road, the truck turned over on its side and came to rest back in the middle of the highway. Robinson admitted his fault in causing the accident.

Hawkins was not injured in the accident, but Robinson suffered a cut on his elbow and what would later be discovered to be a fractured sternum, fractured ribs, and a fractured vertebrae. After being treated for the cut on his elbow at a local hospital and released, Robinson and Hawkins returned to South Carolina on an airplane. Upon their return, the appropriate workers' compensation forms were completed and submitted.

On December 23, 1993, the day after the accident, Robinson sought medical treatment from Dr. A.R. Moss in Gaffney, South Carolina, Overnite's company doctor. Dr. Moss treated Robinson, decided to keep him out of work until December 29, 1993, and scheduled a follow-up visit for that date.

On December 29, 1993, Dr. Moss saw Robinson again and placed him on administrative light duty for up to four hours per day until January 4, 1994. Overnite complied with Dr. Moss's recommendation and assigned Robinson to administrative duties. On January 4, 1994, Robinson visited Dr. Moss for the third time and was cleared to return to driving on January 9, 1994.

During the time that Robinson was on administrative light duty, he continued to experience pain in his chest and back, which did not improve. As a result, Robinson became frustrated with the treatment he received from Dr. Moss and complained to Nolley about what he believed was inadequate care.

4

On January 5 or 6, 1994, Nolley met with Robinson about the impact of his accident on his employment with Overnite. Because Nolley considered Robinson's accident to be particularly serious, he had discussed Robinson's possible discharge with Overnite's home office. In light of Robinson's previous good driving record, however, Nolley determined that he would retain Robinson but place him on probation. When he met with Robinson, Nolley informed him of his decision and explained to Robinson that any further violation of the company's safety rules and regulations within a twelve-month period would lead to his termination. Robinson did not voice any objections about this probation period, and these restrictions were memorialized in a Corrective Action Report (CAR) according to Overnite's policy.

On January 10, 1994, Robinson saw Dr. Moss for the last time while employed at Overnite. Dr. Moss completed another evaluation form, sending Robinson for a second opinion with an orthopedic surgeon because of his continuing back pain. In addition, Dr. Moss imposed a 25-pound lifting restriction, noted Robinson's continued complaints of back pain, and prohibited Robinson from operating heavy equipment. Finally, Dr. Moss noted on the evaluation form that Robinson had bronchitis which was aggravating his chest wall pain.

When Robinson returned to Overnite, he gave the evaluation form to Mark Patterson, the Line Haul Manager, who subsequently called Dr. Moss and confirmed that Robinson was cleared to return to driving. Robinson was then placed back on the driving schedule beginning Monday, January 17, 1994.

After learning that he had been placed back on the driving schedule, Robinson complained to Patterson that he would not be able to drive a truck beginning the following week because of chest pain. Relying on the notation in Dr. Moss's report that Robinson had bronchitis, Patterson told Robinson that workers' compensation would not cover bronchitis and recommended to Robinson that he file a casual sick pay application, according to Overnite's casual sick pay policy covering minor illnesses. Robinson then completed a casual sick pay application and took two days off work. In his sick pay application, Robinson stated that he was requesting time off for bronchitis and a cough and that the condition was not the result of an accident.

5

On January 14, 1994, Robinson came to Overnite to pick up a blank evaluation form for his appointment that day with Dr. Richard Gardner, the orthopedic surgeon to whom he had been referred by Dr. Moss. At that time, Patterson presented Robinson with the CAR and told Robinson that he needed to read and sign it. Robinson stated that he did not want to sign the CAR until his wife had reviewed it, and Patterson agreed. After Robinson had left for his appointment with Dr. Gardner, Patterson spoke with the personnel office at Overnite and was reminded that employees were required to sign a CAR on the same day they received one as an acknowledgment that they had notice of its terms.

Later that afternoon, Robinson returned to Overnite following his appointment with Dr. Gardner. Upon his return, Robinson met with Patterson and handed him an evaluation form completed by Dr. Gardner, in which Dr. Gardner restricted Robinson from driving and advised that Robinson was not at "maximum medical improvement."[2] (J.A. 611). When Robinson gave Patterson the form, Patterson told Robinson that he needed to sign the CAR that day. Robinson refused to sign the CAR and was immediately suspended. On the following Monday, January 17, 1994, Nolley called Robinson and fired him over the telephone for insubordination.

On January 3, 1995, Robinson filed a complaint in state court alleging claims for retaliatory discharge in violation of South Carolina Code § 41-1-80, breach of contract, and breach of an implied contract coupled with fraud. Following the removal of the complaint, based on diversity of citizenship, to the United States District Court for the District of South Carolina on February 2, 1995, Robinson amended his complaint to add several violations of the FMLA.

On June 30, 1995, Overnite moved for summary judgment on all of Robinson's claims. On July 21, 1995, the district court held a hearing on Overnite's motion for summary judgment, and on August 14, 1995, the district court entered an order denying Overnite's motion for summary judgment on all counts.

_____

[2] Dr. Gardner did not diagnose Robinson's fractured sternum, fractured ribs, or fractured vertebrae during this visit; only subsequently did Robinson learn of the extent of his injuries.

On August 23, 1995, the morning of trial, the district court <u>sua sponte</u> reconsidered its earlier denial of Overnite's motion for summary judgment as to Robinson's breach of contract and breach of an implied contract accompanied by a fraudulent act claims. After hearing brief argument from both parties, the district court granted summary judgment to Overnite on both of Robinson's contract-based claims. The district court found that the disclaimer in the Handbook, stating that an employment-at-will relationship existed between Overnite and its employees, was sufficiently conspicuous and that a reasonable person should have noticed it. The district court held, therefore, that Robinson was an at-will employee and could be terminated at will.

On August 23 and 24, 1995, the district court conducted a bench trial on remaining causes of action, the retaliatory discharge claim and the FMLA claims. On October 31, 1995, the district court ruled in favor of Overnite on each of Robinson's remaining claims. The district court found that Robinson had produced no evidence suggesting that he would not have been discharged but for his workers' compensation claim. Rather, according to the district court, all of the evidence suggested that Robinson was terminated for his refusal to sign the CAR. Since Robinson failed to produce any evidence of a causal nexus between his termination and his workers' compensation claim, the district court held that his retaliatory discharge claim under South Carolina Code § 41-1-80 must fail.

With regard to Robinson's FMLA claims, the district court held that the FMLA includes a notice requirement and that unless an employee requests FMLA leave, or otherwise puts the employer on reasonable notice of the employee's desire for FMLA leave, the employee is not entitled to such leave. The district court found that in this case, Robinson never gave Overnite reasonable notice of his desire for FMLA. Therefore, the district court held that Overnite did not violate the FMLA.

Robinson noted a timely appeal.

7

II.

A.

Whether a party was entitled to summary judgment is a matter of law which we review de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

B.

Robinson first argues that the district court erroneously granted Overnite's motion for summary judgment as to his breach of contract and breach of an implied contract coupled with fraud claims on the ground that Robinson was an at-will employee who could be terminated at any time. See Kumpf v. United Tel. Co. , 429 S.E.2d 869, 871 (S.C. Ct. App. 1993) (recognizing that doctrine of termination at will is the law of South Carolina). Instead, Robinson argues that the Handbook altered his at-will status, creating an obligation on the part of Overnite to comply with its provisions.**3**

We need not address whether the disclaimer contained in the Handbook was conspicuous as a matter of law because even if the district court erred in so holding, the district court properly granted Overnite's motion for summary judgment as to Robinson's breach of contract claims because Robinson did not produce any evidence that

_____

**3** Under South Carolina law, "an employer may become contractually bound by the provisions of its employee handbook absent a conspicuous disclaimer or provision to the contrary." Hannah v. United Refrigerated Services, Inc., 430 S.E.2d 539, 541 (S.C. Ct. App. 1993). Thus, if an employer wishes to issue policies, manuals, or bulletins as purely advisory statements with no intent of being bound by them, the employer must "insert[ ] a conspicuous disclaimer or provision into the written document." Small v. Springs Indus., Inc., 357 S.E.2d 452, 454-55 (S.C. 1987).

Overnite breached any particular provision of the Handbook when it terminated him. Robinson argues that Overnite violated two distinct provisions of its Handbook when it terminated his employment. First, Robinson argues that Overnite violated the provision of the Handbook that provided that "[a]ny driver involved in three (3) preventable accidents within twelve (12) consecutive months, shall be terminated regardless of the amount of property damage. . . . Depending upon the circumstances and severity, even one (1) accident may result in dismissal." (J.A. 605). Second, Robinson alleges that Overnite violated its Driver Appeal Policy, providing for an appeal mechanism for Overnite drivers who are terminated for an alleged safety violation.

The central problem with both of Robinson's arguments is that they rest on the premise that Robinson's employment with Overnite was terminated for a safety violation. However, following the bench trial, the district court found that Robinson was terminated for his refusal to sign the CAR, not for his accident or for any other safety violation. Although Robinson argues that the district court's finding that he was fired because he refused to sign the CAR was clearly erroneous, the district court relied on specific testimony supporting its conclusion and Robinson cites no evidence to the contrary. Specifically, the district court relied on Nolley's testimony that it was Overnite's policy to terminate the employment of any employee who refused to sign a CAR and that every employee at the Gaffney facility who refused to sign a CAR had been discharged.

In arguing that the district court's finding that he was terminated for failing to sign the CAR was clearly erroneous, Robinson relies primarily on the district court's own statement in its order that "[n]o one told [Robinson] that his failure to . . . sign the CAR would be considered insubordinate, nor did anyone tell him that failing to sign the form would result in his termination." (J.A. 32). However, whether anyone told Robinson that a refusal to sign the CAR would be considered insubordinate or that such conduct would result in his termination does not undermine the district court's conclusion that it was this behavior that caused Robinson's termination. In addition, preceding the statement quoted above, the district court stated that upon Robinson's return from his appointment with Dr. Gardner on January 14, 1994, "Mr. Patterson told [Robinson] that Mr. Patterson had been instructed by the main office that Mr. Robinson had to sign the CAR

9

that day." Id. Thus, the district court found that Robinson had been instructed to sign the CAR. In light of the fact that Robinson did not sign the CAR that day, the district court made no findings inconsistent with its ultimate conclusion that Robinson was terminated for failing to sign the CAR.

Because Robinson was fired for refusing to sign the CAR, not because of his accident, the Handbook provisions relating to the number of accidents that will lead to termination or an appeal policy for drivers terminated for the violation of safety regulations are not implicated in this case. Instead, the pertinent Handbook section is the section on employee conduct, which provides that an employee may be subject to disciplinary action, including dismissal, for insubordination. Because the contract provisions allegedly breached by Overnite are not applicable and because the Handbook states explicitly that an employee may be terminated for insubordination, the reason articulated by Overnite, the district court did not err when it granted Overnite's motion for summary judgment as to Robinson's claims based on breach of contract.

III.

A.

On an appeal from a bench trial, we may only set aside findings of fact if they are clearly erroneous, and we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. See FED. R. CIV. P. 52(a). We review the district court's conclusions of law de novo. Resolution Trust Corp. v. Maplewood Inv., 31 F.3d 1276, 1281 n.7 (4th Cir. 1994).

B.

Following the bench trial, the district court first held that Robinson had failed to produce sufficient evidence of a retaliatory discharge in violation of South Carolina Code § 41-1-80. Robinson argues that the district court overlooked evidence that Overnite's asserted reason for terminating Robinson was pretextual for retaliatory animus.

10

Section 41-1-80 provides that "[n]o employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law (Title 42 of the 1976 Code), or has testified or is about to testify in any such proceeding." S.C. CODE ANN. § 41-1-80 (Law Co-op. Supp. 1995). In order to prove a claim under § 41-1-80, a plaintiff must show: (1) the institution of workers' compensation proceedings; (2) a discharge or demotion; and (3) a causal connection between the institution of workers' compensation proceedings and the discharge or demotion. See Hines v. United Parcel Serv., Inc., 736 F. Supp. 675, 677 (D.S.C. 1990). In order to establish a causal connection between the workers' compensation proceeding and the discharge or demotion, the employee must establish that "he would not have been discharged `but for' the filing of the claim." Wallace v. Milliken & Co., 406 S.E.2d 358, 360 (S.C. 1991). If the employer articulates a legitimate, nonretaliatory reason for the termination or demotion, the proximity in time between the injury and the termination or demotion is not sufficient evidence to carry the employee's burden of proving a causal connection. See Johnson v. J.P. Stevens & Co., Inc., 417 S.E.2d 527, 529 (S.C. 1992) ("In light of the conceded legitimate, nonretaliatory motives for the termination, [the] proximity in time does not meet the employee's burden of proof."); Marr v. City of Columbia, 416 S.E.2d 615, 617 (S.C. 1992) (rejecting retaliatory discharge claim where only evidence suggesting retaliatory motive for discharge was temporal proximity of claim to discharge).

In arguing that he has established a claim for retaliatory discharge under § 41-1-80, Robinson relies primarily on his contention that the district court's finding that he was terminated for failing to sign the CAR is clearly erroneous. According to Robinson, the district court overlooked evidence that Overnite's articulated reason for Robinson's discharge was pretextual. However, as stated above, there was sufficient evidence to support the district court's conclusion that Robinson was discharged for failing to sign the CAR when instructed to do so. Nolley testified that at least two other employees had been discharged for the same reason and that it was Overnite's policy to discharge anyone who would not sign the CAR. Robinson has produced no evidence contradicting Nolley's testimony, nor has Robinson produced evidence of any retaliatory animus directed at either him personally

11

or at workers' compensation claimants in general by Overnite. Instead, the only evidence Robinson produced of a causal connection between his termination and his workers' compensation claim was their temporal proximity. As noted above, however, where an employer has articulated a legitimate, nonretaliatory reason for the termination, this evidence is not sufficient to establish that the two were causally related under South Carolina law. See, e.g., Marr, 416 S.E.2d at 617; Johnson, 417 S.E.2d at 529. Because Robinson failed to produce sufficient evidence of a causal connection between his workers' compensation claim and the termination of his employment with Overnite, we affirm the district court's judgment in favor of Overnite on Robinson's claim for retaliatory discharge in violation of South Carolina Code § 41-1-80.

C.

Finally, Robinson appeals the district court's judgment in favor of Overnite on his FMLA claims. In appealing the district court's judgment, Robinson argues, first, that the district court erred when it held that Robinson did not place Overnite on sufficient notice that he had a "serious health condition," see 29 U.S.C. § 2612(a)(1)(D) (entitling eligible employee to twelve workweeks of leave for a "serious health condition"), and, second, that the district court erred when it held that Overnite did not violate the FMLA by interfering with his right to medical leave under the FMLA, see 29 U.S.C. § 2615(a) (prohibiting employers from interfering with, restraining, or denying the exercise of any rights under the FMLA). We will first set forth the pertinent provisions of the FMLA and then address each of Robinson's arguments in turn.

1.

Under the FMLA, an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under the interim regulations in effect at the time of Robinson's injury and termination,[4] a "serious health condi-

_____

[4] The Secretary of Labor released final regulations effective February 6, 1995. See The Family and Medical Leave Act of 1993, 60 Fed. Reg.

12

tion" is an illness, injury, impairment, or physical or mental condition that involves "[a]ny period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider." 29 C.F.R. § 825.114(a)(2) (1993). In addition to requiring that an employee have a "serious health condition," the interim regulations also require that "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case." Id. § 825.303(a). Although an employee must provide his employer with notice of his need for FMLA leave, he is not required to expressly mention the FMLA. See id. § 825.302(c); Manuel v. Westlake Polymers Corp., 66 F.3d 758, 763 (5th Cir. 1993). Rather, it is sufficient for the employee to notify his employer that "leave is needed for an expected birth or adoption, for example." 29 C.F.R. § 825.302(c) (1993). Upon return from FMLA leave, the interim regulations provide that an employee is entitled "to be returned to the same position the employee held when leave commenced, or to an equivalent position . . . ." Id. § 825.214(a).

In addition to granting eligible employees the right to leave for certain family and medical reasons under § 2612(a), the FMLA also explicitly prohibits employers from interfering with an employee's exercise of his rights under the FMLA: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). With regard to what conduct constitutes "interfering with" any employee's rights in violation of § 2615(a)(1), the interim regulations provide that "[a]ny violations of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA]." 29 C.F.R. § 825.220(b) (1993). The regulations provide further that "`[i]nterfering with' the exercise of an employee's rights would

_____

2180 (1995). Because Overnite's decision to terminate Robinson's employment occurred prior to the release of the final regulations, however, the interim regulations govern this dispute. See Manuel v. Westlake Polymers Corp., 66 F.3d 758, 761 n.2 (5th Cir. 1995).

13

include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Id.

The interim regulations also contain a number of provisions pertinent to this appeal that are designed to ensure that employees are adequately informed of their rights under the FMLA. For example, 29 C.F.R. § 825.301(a) provides that "[i]f an employer has any written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning FMLA entitlements and employee obligations under the FMLA must be included . . . ." 29 C.F.R. § 825.301(a) (1993). In addition, the regulations provide that when an employee gives notice of his need for FMLA leave, the employer must provide the employee with information detailing the specific expectations and obligations of the employee, including any consequences of a failure to meet these obligations. Id. § 825.301(c). Finally, the regulations require each employer to post a notice explaining the FMLA's provisions and providing information concerning the procedures for filing complaints of violations of the FMLA in conspicuous places where employees are located. Id. § 825.300(a).

2.

Robinson first argues that the district court erroneously held that he had failed to provide Overnite with reasonable notice of his need for FMLA leave. Robinson asserts, in particular, that his complaints to both Patterson and Nolley about his back pain, Dr. Moss's report indicating acute lumbosacral strain, a chest contusion, and continued back pain, and Dr. Gardner's report recommending no driving or lifting were sufficient to put Overnite on notice of his need for leave because of a "serious health condition."

As noted above, under the regulations in effect at the time of Robinson's injury and termination, Robinson did not have to expressly assert his rights under the FMLA to be considered to have given sufficient notice of his need for FMLA leave. Manuel , 66 F.3d at 763. Instead, he simply had to give Overnite notice of his need for leave because of a qualifying reason, such as a serious health condition. See 29 C.F.R. § 825.302(c) (1993). In this case, however, the evidence is undisputed that as of January 9, 1994, Robinson had been cleared to

14

resume driving by Dr. Moss, giving Overnite no reason to believe that Robinson needed FMLA leave for "a serious health condition that ma[de] [Robinson] unable to perform the functions of [his] position." See 29 U.S.C. § 2612(a)(1)(D). Although Dr. Gardner's report of January 14 restricted Robinson from driving, arguably placing Overnite on notice of the serious nature of Robinson's injury, Robinson testified that at approximately the same time that he handed Dr. Gardner's report to Patterson, Patterson handed him the CAR and insisted for the final time that he sign it. In addition, Patterson testified that he had not seen Dr. Gardner's report at the time that Robinson was suspended, testimony that is consistent with the conclusion that Overnite was not made aware of the serious nature of Robinson's injury at the time that it took disciplinary action against him for refusing to sign the CAR. Because the record contains sufficient evidence to support the district court's finding that Robinson failed to inform Overnite of facts that could have put Overnite on notice of his need for FMLA leave, this finding is not clearly erroneous and should not be disturbed on appeal.**5**

_____

**5** Robinson also argues that the district court applied the wrong legal standard to the FMLA notice requirement, requiring Robinson to invoke explicitly the FMLA when requesting leave. As support, Robinson relies on the fact that the district court stated during the trial that Overnite had knowledge of Robinson's injury as described by Dr. Gardner, yet nevertheless concluded that Robinson had not provided sufficient notice of his need for leave to invoke his rights under § 2612(a). However, the district court made the statement regarding Overnite's knowledge in the context of a ruling that any further evidence regarding Overnite's knowledge would be cumulative. The district court explicitly found that Robinson "never requested FMLA leave <u>nor informed Overnite of facts that could have reasonably put Overnite on notice of [his] desire or need to take FMLA leave</u>." (J.A. 33 (emphasis added)). This explicit finding demonstrates that the district court was aware that informing an employer of facts supporting the need for leave sufficiently places that employer on notice under the FMLA. <u>See</u> 29 C.F.R. § 825.302(c) (1993). Therefore, Robinson's argument that the district court applied the wrong notice standard must fail.

15

3.

Finally, Robinson asserts that the district court erred when it held that Overnite had not "interfered with" his rights under the FMLA in violation of 29 U.S.C. § 2615(a). Specifically, Robinson argues that Overnite violated the interim regulations implementing the FMLA by: (1) failing to provide sufficient notice to its employees of their rights under the FMLA by placing such notice in the employee handbook or on conspicuous bulletin boards, see 29 C.F.R. §§ 825.301(a), 825.300(a) (1993); (2) failing to explain to Robinson his rights under the FMLA once on notice of Robinson's need for leave, see id. § 825.301(c); and (3) interfering with Robinson's right to reinstatement upon his return from FMLA leave, see id. § 825.214(a). These arguments have no merit.

Addressing Robinson's first contention that Overnite failed to provide sufficient notice to its employees of their rights under the FMLA, the trial testimony indicated that, within a few weeks of the effective date of the FMLA, Overnite had revised its family and medical leave policy and disseminated the new policy to all employees at the Gaffney facility during employee meetings held to discuss the new policy or with their paychecks. In addition, FMLA notices were posted on the permanent bulletin boards in the drivers' area, and an FMLA notice was contained in the first employee handbook to be distributed in June 1994, following the effective date of the FMLA. There was sufficient evidence, therefore, from which the district court could conclude that Overnite fully complied with its notice requirements under the interim regulations, both by providing notice of the FMLA at the time of the effective date and by including information about the FMLA in its first handbook issued after the effective date.

Addressing Robinson's second contention that Overnite failed to provide him with notice of his rights under the FMLA at the time Overnite was put on notice of his need for leave, as discussed above, the district court held that Robinson never placed Overnite on notice of his need for leave, as required under the FMLA, a conclusion supported by the record. Because Overnite was never on notice of Robinson's need for FMLA leave, Overnite's duty to explain to Robinson his rights and responsibilities under the FMLA, as provided in 29 C.F.R. § 825.301(c), was never triggered.

16

Finally, with regard to Robinson's assertion that Overnite interfered with his right to be reinstated into his former position in violation of 29 C.F.R. § 825.214(a), Robinson argues that the imposition of a probationary period in accordance with the CAR fundamentally changed the nature of his position at Overnite. First, Robinson cites no authority for the proposition that the imposition of a period of probation changed the nature of his position as a truck driver, such that it would not be deemed "equivalent" under§ 825.214(a). In addition, Nolley testified that Robinson was being placed on probation because he had violated safety rules and caused a serious accident, not because he had taken leave as a result of injuries sustained in the accident. Because Robinson failed to produce evidence supporting a violation of any of the regulatory provisions on which he relies, the district court did not err in holding that Robinson failed to prove that Overnite "interfered with" the exercise of his rights under the FMLA.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment as to Robinson's claims based on breach of contract and the district court's judgment following a bench trial in favor of Overnite as to Robinson's retaliatory discharge and FMLA claims.

<u>AFFIRMED</u>

17